IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| NEIL BURT, | |
| Plaintiffs, | CIVIL ACTION FILE |
| v. | NO. 1:04-CV-2376-BBM |
| METROPOLITAN LIFE INSURANCE COMPANY, | |
| Defendant. | |

## <u>O R D E R</u>

This action alleging wrongful denial of disability insurance benefits and breach of fiduciary duty under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 <u>et seq.</u>, is before the court on Plaintiff's Motion for Summary Judgment [Doc. No. 13]; Defendant's Motion for Summary Judgment [Doc. No. 14]; Plaintiff's Consent Motion to Amend Plaintiff's Statement of Material Facts In Support of His Motion For Summary Judgment and Plaintiffs' Brief In Support of His Motion For Summary Judgment [Doc. No. 17]; and Defendant's Motion to Correct Defendant's Memorandum in Opposition to Plaintiff's Motion For Summary Judgment [Doc. No. 24].

## I.   __Factual and Procedural Background__

The facts presented here derive from the parties' statements of material facts attached to their pleadings as well as the court's independent review of the record.[1]

On January 1, 2001, the Defendant, Metropolitan Life Insurance Company ("MetLife"), contracted with KPMG Consulting LLP ("KPMG") to pay from MetLife's own assets long-term disability benefits to insured KPMG employees.  That coverage continued after KPMG changed its named to BearingPoint, Inc. ("BearingPoint") on January 1, 2003.  As a senior manager at BearingPoint, the Plaintiff, Neal Burt ("Mr. Burt"), was covered under this long-term disability benefits plan (the "Plan") as of June 15, 1998.

There appears to be no dispute that Mr. Burt's job at BearingPoint demanded much of his time, his talent, and his energy.  BearingPoint required Mr. Burt to lead sales and delivery efforts, workshops, and sales presentations, all the while demonstrating good written and verbal communications skills, strong business and strategy skills, and a willingness to commit to "100% travel."  Mr. Burt's professional

---

[1]This case is before the court on cross motions for summary judgment.  Therefore, where one of the parties has disputed a specific fact and pointed to evidence in the record supporting his/its version of the event, the court will view all evidence and factual inferences in the light most favorable to that party, as required on an opposing party's motion for summary judgment. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

development goals, outlined in a "Senior Manager Performance Matrix," included retaining all "named and strategic accounts,"and managing "high end" projects, each of which staffed from twenty-five to fifty professionals and generated fees between $5 million and $200 million.

Mr. Burt claims to have developed an alcohol abuse problem while at BearingPoint. Allegedly in recognition of this problem, on December 5, 2001, Mr. Burt consulted a psychiatrist, Asaf Aleem ("Dr. Aleem"), concerning severe panic attacks he allegedly suffered as a result of alcohol withdrawal. On April 26, 2002, Mr. Burt temporarily stopped working at BearingPoint and checked himself into Peachford Behavioral Health System of Atlanta ("Peachford Hospital") for alcohol addiction.

Peachford Hospital discharged Mr. Burt on May 2, 2002, after he had completed detoxification treatment. Over the next several weeks, Mr. Burt attended multiple group therapy sessions as an outpatient, the records of which indicate that Mr. Burt discussed depression, bipolar disease, and a tendency to isolate himself. After these sessions, Mr. Burt remained off-the-job, though he continued to see Dr. Aleem. A "Mental Status Exam" signed by Dr. Aleem dated June 7, 2002, indicates that Mr. Burt reported a "little mania" and depression.

Starting on May 1, 2002, Mr. Burt received short-term disability benefits from

MetLife.   On August 1, 2002, Mr. Burt returned to work on a full-time basis.   He remained on the job until September 13, 2002, when he again left on short-term disability.   By letter dated June 26, 2003, MetLife informed Mr. Burt that his short-term disability benefits would be extended through March 14, 2003,[2] the maximum duration allowable under the Plan.   MetLife does not deny that this letter indicated its determination that under the short-term plan Mr. Burt remained disabled, by which MetLife meant "that due to sickness, accidental injury, or both, [Mr. Burt was] unable to perform for wage or profit the material and substantial duties of [his] Own Occupation and [he was] under the regular care of a Doctor."

Mr. Burt continued to seek treatment by Dr. Aleem.   A "Mental Status Exam"signed by Dr. Aleem and dated October 15, 2002, indicated that Mr. Burt complained that he could neither concentrate nor "do [his] job."   Furthermore, a "Psychiatric Assessment" signed by Dr. Aleem and dated December 10, 2002, noted that Mr. Burt complained of an inability to think, depression, and anxiety.

On July 7, 2003, Mr. Burt applied to MetLife for long-term disability benefits. The Summary Plan Description provided the following definition of disability:

For the first 36 month period following your Elimination Period, you are

---

[2]While it seems curious to the court that a June, 2003 letter would refer to an extension until March, 2003, these dates are those actually taken from the letter which is in the record of this proceeding.

unable to perform the material and substantial duties of your Own Occupation, are under the regular care of a Doctor and are not working at any job for wage or profit, unless in an approved Rehabilitation Program; . . . After the first 36 month period, you are unable to perform any job for which you are qualified or for which you may become reasonably qualified taking into account your training, education or experience.

The Summary Plan Description further required, in relevant part, that to receive benefits under the Plan, a claimant must provide, "subject to [MetLife's] satisfaction," documents pertaining to (1) "Proof of Disability"; (2) "Evidence of continuing Disability"; (3) "Proof that [the claimant is] under the Appropriate Care and Treatment of a Doctor throughout [his or her] disability"; and (4) "Any other material information related to [the claimant's] Disability which may be requested by [MetLife]."

In addition, a claimant seeking benefits as a result of a mental or nervous disorder or disease must prove that he or she suffers from such a disorder or disease that is of "sufficient severity to meet the Diagnostic and Statistical Manual of Mental Disorders" and that he is "receiving Appropriate Care and Treatment . . . by a mental health Doctor."   Finally, the Summary Plan Description includes a clause granting MetLife "discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits."

On his application form for long-term disability benefits, Mr. Burt reported his

inability to perform his job duties "without experiencing severe anxiety and panic disorder," but that he could return to his senior manager position should BearingPoint only require him to work five to ten hours a week with no travel. Moreover, Mr. Burt described his daily routine as follows: "wake up, eat breakfast, walk dogs, meet friends at Starbucks, go to A[lcoholics] A[nonymous] meetings, go home, watch TV, go to sleep."

Dr. Aleem completed part of Mr. Burt's long-term benefits application, reporting that Mr. Burt suffered from a "Class 5" limitation -- that is, a "significant loss of psychological, physiological, personal and social adjustment." Dr. Aleem also stated that Mr. Burt suffered from panic disorder and major depression; that his Global Assessment Functioning scale number had declined from 50 on December 5, 2001, to 40 on July 2, 2002;[3] that his thought processes were not working; and that he was presently taking at least four prescription medications. Dr. Aleem also indicated

---

[3]The range between 41 and 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." The range between 31 and 40, on the other hand, indicates "some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. text rev. 2000).

that he had "assessed by self-report" that Mr. Burt suffered panic attacks and a "fear of social contacts[.]"  Dr. Aleem, however, did not report any "objective findings."[4]

On August 19, 2003, MetLife concluded that there was insufficient documentation to support a finding that Mr. Burt suffered from symptoms that prevented him from performing his job, and by letter dated August 27, 2003, MetLife denied Mr. Burt's long-term benefits claim.

Mr. Burt appealed this decision by letter on September 11, 2003, citing his inability "to be in large crowds without experiencing panic attacks"; to make "sales or project progress reports"; his "significant fear of leaving the small area surrounding [his] home"; his loss of "all confidence in [his] leadership abilities"; and his inability to multitask or keep track of his daily activities.  Mr. Burt enclosed Dr. Aleem's physician progress notes, which showed that during three separate visits between July 2, 2003, and September 10, 2003, Mr. Burt reported that he was depressed, withdrawn, lethargic, easily distracted, anxious, stricken by panic attacks,

---

[4]In its Memorandum In Support of Defendant's Motion for Summary Judgment, filed April 15, 2005, at 24 n.5 [Doc. No. 14], MetLife points to the Minnesota Multiphasic Personality Inventory–2 as "one such objective test used to help diagnose psychiatric disorders such as depression and anxiety."  While this court expresses no opinion as to whether the adjective "objective" properly characterizes this test or whether this test is even applicable to Mr. Burt's condition, the court notes that it did not find record evidence that MetLife requested Mr. Burt to undergo this particular test.

and that his medications were not working.  On each of these notes, Dr. Aleem circled the boiler-plate term "continue disability."

MetLife responded to Mr. Burt's appeal by letter dated September 19, 2003, informing Mr. Burt that his claim had been "referred for an independent claim review."  On October 6, 2003, Leonard Kessler, M.D. ("Dr. Kessler"), performed this review, finding that (1) there was "no diagnosis of Alcohol Dependence and no participation in a substance abuse program" nor any "medical documentation" that Mr. Burt's last use of alcohol was on April 24, 2002; (2) Mr. Burt's daily activities, including his attendance and participation at Alcoholics Anonymous meetings, his meetings with friends, his use of a digital camera and computer, as well as his commitment to walking his dog in the morning, was inconsistent with Dr. Aleem's reports of social isolation; and (3) while Mr. Burt had "reported adverse effects" resulting from his use of prescription medications, "he continue[d] them nevertheless," a fact apparently consistent with Dr. Aleem's indication on some progress notes that "there [had] not been any side effects" from the medication. Therefore, Dr. Kessler concluded that Mr. Burt had not provided sufficient documentation to qualify for long-term disability payments, and on October 15, 2003, MetLife again denied Mr. Burt's claim.

A little more than a week earlier, on October 16, 2003, Mr. Burt had sent a letter to the commissioner of insurance at his offices in Atlanta, Georgia, detailing MetLife's continuing denial of long-term benefits to him.

On October 30, 2003, Mr. Burt appealed his claim for a second time, faxing to MetLife a "to whom it may concern" letter, signed by Dr. Aleem and dated October 28, 2003.[5]  In that letter Dr. Aleem stated that Mr. Burt was "chronically depressed"; that he continued "to suffer from Panic Attacks and generalized anxiety"; that "[h]is cognitive and emotional states d[id] not allow him to perform his prior duties of Senior Manager"; that his "ability to consistently perform work duties on a daily basis" was "inhibit[ed]"; and that his attendance at Alcoholics Anonymous meetings was a "functional part of his treatment and not a socializing activity."  Dr. Aleem further recommended an independent medical evaluation.

On November 11, 2003, MetLife consulted Dr. Mark Schroeder, M.D., ("Dr. Schroeder"), concerning Mr. Burt's appeal.  Dr. Schroeder concluded that "the medical documentation [did] not substantiate sustained, global, specific and objective

---

[5]This fax transmission is actually dated September 30, 2003.  Based on relevant surrounding circumstances and the fact that the accompanying letter from Dr. Aleem was dated October 28, 2003, this court suspects that the September 30, 2003, date was error and the true date of transmission was October 30, 2003.  This determination has no impact on the outcome of this case.

psychiatric functional impairment sufficient to prevent [Mr. Burt] from performing the essential duties of his own occupation." Dr. Schroeder based his

opinion, in part, on the fact that Mr. Burt's "well organized and detailed appeal letters, while not in themselves showing a work capacity, d[id] not support the existence of severe cognitive impairment." Dr. Schroeder further concluded that there was no need for an independent medical expert in this case, and MetLife continued its denial of long-term disability benefits.

On November 18, 2003, Mr. Burt attended an evaluation with another psychiatrist, Mark C. Hutto, M.D. ("Dr. Hutto"), who scored Mr. Burt at 54 on the Beck Depression Inventory, which is a standardized psychiatric diagnostic test in which the subject reports, on a sliding scale, his response to various statements.[6] Dr. Hutto diagnosed Mr. Burt with bipolar disorder, depression, stress related to his job, and severe panic disorder. Dr. Hutto also reported discussing various additional treatments with Mr. Burt, including an increase in the dosage of his medications, the addition of a mood stabilizer and an anti-depressant to his medication regimen, and electroconvulsive therapy.

---

[6]For example, each of four statements -- "I do not feel sad," "I feel sad much of the time," "I am sad all the time," and "I am so sad or unhappy that I can't stand it" -- are assigned a numerical value, and the subject must circle the number corresponding with the statement that most closely corresponds with his or her present mental or emotional state.

Mr. Burt, through his legal counsel Rogers & Hofrichter, P.C. ("Rogers & Hofrichter"), appealed MetLife's denial of long-term benefits for a third time on December 1, 2003.  This appeal included a copy of the letter Mr. Burt sent to the insurance commissioner, his pharmacy records, a description of the senior manager position at BearingPoint, and another mental status report from Dr. Aleem, which again concluded that Mr. Burt was unable to work, easily distracted, had a sad affect and a slowed thought pattern.   On December 30, 2003, Mr. Burt's counsel sent yet another appeal letter to MetLife, and, on January 5, 2004, submitted additional medical records from Dr. Aleem indicating medication side effects of diarrhea and drowsiness.

On January 9, 2004, MetLife advised Rogers & Hofrichter that it would refer Mr. Burt's appeal for another review, which Dr. Schroeder conducted on February 3, 2004.  This review concluded that Dr. Aleem's submissions lacked "detailed objective information addressing [Mr. Burt's] psychiatric functional capacity," and that there was no "detailed objective information," such as a "detailed cognitive mental status examination or neuropsychological test" supporting Dr. Aleem's description of Mr. Burt as "showing poor concentration."

On February 11, 2004, Dr. Aleem wrote another letter to MetLife, substantially repeating the diagnoses he had previously offered, and on February 20, 2004, MetLife

received Dr. Hutto's November 22, 2003, write-up of his

analysis of Mr. Burt, including the first page of the two page Beck Depression

Inventory test administered to Mr. Burt.

On March 2, 2004, Dr. Schroeder and Dr. Aleem had a 15 minute conversation

concerning Mr. Burt's medical status.  Dr. Schroeder's notes, dated the same day,

indicate that the doctors discussed Mr. Burt's appearance:  He "did not look well

physically (appearing bloated)," and while "[Mr. Burt's] personal hygiene was

reasonable," his "eye contact was poor."  Dr. Schroeder also noted that Mr. Burt "had

reported symptoms of feeling chronically depressed, no energy, no motivation,

anxiety, difficulty focusing, not liking to leave the house, and memory problems."

In completing his review, Dr. Schroeder also considered Dr. Hutto's report,

which included the handwritten note:  "typical day, up at 8:00, take dogs to lake,

takes pictures, visits friends at Starbucks . . . AA weekly."  As for the Beck Depression

Inventory administered to Mr. Burt, Dr. Schroeder determined that this test was "a

transparent instrument of self-report without a validity scale that has not been shown

to be valid or reliable in the assessment of impairment."  Dr. Schroeder therefore

concluded that the assignment of a Global Assessment Functioning score of 25–30[7]

---

[7] This score indicates that the subject's "[b]ehavior is considerably influenced by delusions or hallucinations OR serious impairment, in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability

was not "corroborated by specific objective findings" and that, based on the guidelines of the American Psychiatric Association, there was no evidence that Mr. Burt was "receiving active treatment for a severe mental disorder."[8]

Thereafter, Dr. Aleem prepared a "to whom it may concern letter" dated March 17, 2004, stating that Mr. Burt had "been in outpatient therapy in the past" but that "starting therapy again" would not "have a major effect on his prognosis." Nevertheless, Dr. Schroder concluded on March 18, 2004, that Dr. Aleem's letter did not support a change in his original findings.  On April 5, 2004, MetLife sent a final letter to Mr. Burt stating that his claim remained denied for lack of objective medical evidence and because "[t]he frequency and intensity of treatment" that Mr. Burt was receiving did "not support that [he was] receiving active treatment for a severe mental disorder."

On August 18, 2004, Mr. Burt filed a complaint against MetLife, alleging wrongful denial of long-term disability benefits and breach of fiduciary duty.  MetLife

---

to function in almost all areas (e.g., stays in bed all day, no job, home, or friends). Diagnostic and Statistical Manual at 34.

[8]While there is no record evidence that Mr. Burt was seeing a therapist at the time of Mr. Schroeder's review, there is record evidence that he visited Tommy Boone, a therapist, from December 3, 2002 to April 18, 2003.

filed its answer on October 14, 2004.  On April 15, 2005, both Mr. Burt and MetLife

filed motions seeking summary judgment in this case.

## II.    <u>Summary Judgment Standard</u>

Summary judgment is proper "if . . . there is no genuine issue as to any material

fact" and "the moving party is entitled to a judgment as a matter of law."

Fed. R. Civ. P. 56(c).  In considering a motion for summary judgment, "[t]he evidence

of the non-movant is to be believed, and all justifiable inferences are to be drawn in

his favor."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986).  The court is

mindful that "[c]redibility determinations, the weighing of the evidence, and the

drawing of legitimate inferences from the facts are jury functions, not those of a

judge."  <u>Id.</u>  The plaintiff must do more than show some level of doubt as to the

material facts.   "The mere existence of a scintilla of evidence in support of the

plaintiff's position will be insufficient; there must be evidence on which the jury could

reasonably find for the plaintiff."  <u>Id.</u> at 252.  As such, the non-movant may not avoid

summary judgment with evidence that is "merely colorable or is not significantly

probative."  <u>Raney v. Vinson Guard Serv., Inc.</u>, 120 F.3d 1192, 1196 (11th Cir. 1997).


If the nonmoving party fails to "make a sufficient showing on an essential

element of her case with respect to which she has the burden of proof," then the court must enter summary judgment for the moving party.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).

**III.   <u>Mr. Burt's Claim for Wrongful Denial of Long-term Disability Benefits</u>**

In affirming a District Court's grant of summary judgment, the Eleventh Circuit in <u>Williams v. BellSouth Telecommunications, Inc.</u>, 373 F.3d 1132 (11th Cir. 2004), promulgated a six-step test that courts should employ in "reviewing virtually *all* ERISA-plan benefit denials":

> (1) Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (*i.e.*, the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.
> (2) If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.
> (3) If the administrator's decision is "*de novo* wrong" and he *was* vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).
> (4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.
> (5) If there is no conflict, then end the inquiry and affirm the decision.
> (6) If there is a conflict of interest, then apply heightened arbitrary and capricious review to the decision to affirm or deny it.

<u>Williams</u>, 373 F.3d at 1137–38; <u>see</u> <u>Langford v. UNUM Life Ins. Co.</u>, 138 Fed. Appx. 162, 163–64 (11th Cir. 2005).   Furthermore, the Eleventh Circuit "has . . . declined to

draw a distinction between law and fact in choosing the standard of review for denial

of ERISA benefits." Shaw v. Conn. Gen. Life Ins. Co., 353 F.3d 1276, 1285 (11th Cir.

2003).

In this case, the parties do not dispute that the Plan administrator, MetLife,

"both possessed discretion in denying benefits and suffered from a conflict-of-

interest" -- that is, MetLife's fiduciary responsibilities to the Plan conflicted with its

having to pay eligible participants from its own funds. Wise v. Hartford Life and

Accident Ins. Co., 360 F. Supp. 2d 1310, 1318 n.4 (N.D. Ga. 2005) (Story, J.); see

Williams, 373 F.3d at 1135. Therefore, rather than analyze the six steps of the

Williams test, it is necessary for the court to inquire into only three, which the court

will hereinafter refer to as the "Wise Test":

> First, engaging in a *de novo* review, the Court determines whether the
> decision to deny benefits was "wrong." If it is not, then the
> administrator prevails. In the event that the Court finds the decision
> "wrong," however, it proceeds to the second step to determine whether
> the insurer's decision was nevertheless "reasonable." Should the
> administrator's decision prove both wrong and not reasonable (*i.e.*
> arbitrary and capricious), then the claimant is entitled to prevail.

Wise, 360 F. Supp. 2d at 1318 (internal citations omitted). The third step requires the

court to subject an administrator's decision that was wrong but nevertheless

reasonable to heightened arbitrary and capricious review, which is something more

exacting than arbitrary and capricious review, but more deferential than *de novo*

review.  See id.

> Under the heightened arbitrary and capricious standard of review, the burden shifts to the claims administrator to prove that its interpretation of the plan is not tainted by self–interest.  The claims administrator satisfies this burden by showing that its wrong but reasonable interpretation of the plan benefits the class of participants and beneficiaries.  Even when the administrator satisfies this burden, the claimant may still be successful if he can show by other measures that the administrator's decision was arbitrary and capricious.

HCA Health Services, Inc. v. Employers Health Ins. Co., 240 F.3d 982, 994-95 (11th

Cir. 2001) (internal citations omitted).  To the extent necessary and for the sake of

thoroughness, this court will examine the law and its application to the facts of this

case at each of these three steps.

      A.     *De Novo Review*

The first step of the Wise Test requires Mr. Burt to carry the burden of proving

that Met Life's denial-of-benefits decision is wrong.  See Williams, 373 F.3d at 1138;

see also McAfee v. Transamerica Occidental Life Ins. Co., 106 F. Supp. 2d 1331, 1337

(N.D. Ga. 2000) (Pannell, J.) (citing Horton v. Reliance Standard Life Ins. Co., 141 F.3d

1038, 1040 (11th Cir. 1998)).  The Eleventh Circuit has sharpened this directive by

defining "wrong" as "the label used by our precedent to describe the conclusion a

court reaches when, after reviewing the plan documents and disputed terms, *de novo*,

the court disagrees with the claims administrator's plan interpretation." <u>HCA</u>, 240 F.3d at 994 n.23.

MetLife claims that it correctly denied benefits to Mr. Burt on two grounds: "(1) the medical information did not substantiate [Mr. Burt's] claim that he was unable to perform his occupation; and (2) [Mr. Burt] was not receiving appropriate care." Mem. in Supp. of Def.'s Mot. for Summ. J. at 16 [Doc. No. 14].

1.     *The Sufficiency of Mr. Burt's Medical Information*

In connection with its denial of coverage to Mr. Burt on the basis that the medical information he provided did not substantiate his claim, MetLife advances three separate arguments. The first argument concerns quantity -- Mr. Burt allegedly failed to provide enough documentation of his disability. The second argument concerns quality -- the documentation Mr. Burt did provide allegedly failed to meet MetLife's requirement that the documentation be "objective" rather than based on self-report. The third argument concerns reliability -- all else being equal, MetLife is allegedly entitled to rely on the assessments of Drs. Schroeder and Kessler rather than Drs. Aleem and Hutto.

First, the court reads MetLife's summary judgment motion as asserting that Mr. Burt fell short of complying with the Plan provisions making proof of his disability subject to MetLife's "satisfaction" because Mr. Burt failed to provide sufficient

-18-

"documented proof demonstrating an inability to perform his own occupation."  <u>See</u> Mem. in Supp. of Def.'s Mot. for Summ. J. at 18 [Doc. No. 14].

However, in the court's view, an open-ended term such as "satisfaction" may not properly be transformed into a moving target that is not possible for the claimant to hit.  As the Supreme Court held in <u>Black & Decker Disability Plan v.</u> <u>Nord</u>, 538 U.S. 822 (2003), "[p]lan administrators . . . may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." <u>Id.</u> at 834.  Without recapitulating the statement of facts provided above, this court finds that Mr. Burt as a matter of law has carried his burden of producing a sufficient quantity of evidence to substantiate his continuing, long-term inability to perform "for wage or profit the material and substantial duties of [his] Own Occupation" as senior manager at a highly competitive consulting firm.  In particular, this court points to Dr. Aleem's designation of Mr. Burt as suffering from a "significant loss of psychological, physiological, personal and social adjustment" on his long-term benefits application; Dr. Aleem's circling of the terms "continue disability" in his progress notes concerning Mr. Burt, which MetLife reviewed; as well as Dr. Aleem's letter dated October 28, 2003, stating that Mr. Burt's "cognitive and emotional states d[id] not allow him to perform his prior duties of Senior Manager."  Therefore,

MetLife's determination that there was some deficiency in the quantity of the documentation offered as "proof of disability" is unavailing.

Second, MetLife argues that even if Mr. Burt satisfied his contractual duty to provide credible documentation of his long-term disability, this documentation failed for not being objective.  Within otherwise applicable legal constraints, parties to contracts providing long-term benefit plans are free to bargain their way to an agreement on the terms.  However, once an insured party makes a claim under that contract "administrators and fiduciaries are prohibited from adding a term or extra requirement into an insurance policy that is not expressly part of it." Durr v. Metropolitan Life Ins. Co., 15 F. Supp. 2d 205, 212 (D. Conn. 1998) (citing Duncan v. Continental Cas. Co., Civ. No. 96-2421, 1997 WL 88374, *4 (N.D. Cal. 1997)) (holding that an insurance company could not deny a claim for long-term disability benefits based on a lack of objective medical evidence when the original policy did not refer to the objective medical evidence standard.)

After reviewing the policy, this court finds no such "objective proof" requirement.  MetLife points to the "Benefits Checklist" provision in the Summary Plan Description requiring the claimant to submit "proof" or "evidence" or "other material information" concerning his disability.  Nowhere to be found is the modifier "objective."  As Mr. Burt argues, MetLife might have attached either a "self-reported

illness" or an "objective proof" clause to the provisions governing long-term disabilities due to mental or nervous disorder or disease; Met Life, however, attached neither type of clause.  Additionally, as Mr. Burt has pointed out, MetLife explicitly directed that benefits for nueromusculoskelatal and soft tissue disorders be limited to twenty-four months "unless the Disability has *objective* evidence" (emphasis added).  To read the "proof" language cited by Met Life as implying an objectivity requirement would be to render this other Plan provision redundant and to give MetLife, in effect, more than it bargained for.

MetLife also points to its short-term and long-term disability forms, which invite physicians such as Dr. Aleem to provide "objective findings."  MetLife characterizes this invitation as a "requirement," but points to no contractual language suggesting as much.  Furthermore, these forms invite treating physicians to provide "subjective findings" as well.  This court simply cannot accede to MetLife's attempt to assign such significant legal import to these forms.  Rather, these boilerplate forms offer one mechanism for treating physicians to sort the information they provide to MetLife.  The court declines the invitation to read these forms as anything more.  Therefore, MetLife's interpretation of the Plan as imposing an objective evidence requirement fails as well.

Regardless of its legal interpretation of the Plan, MetLife further argues that it is entitled to rely on the findings of Drs. Schroeder and Kessler, who determined that Mr. Burt had failed to provide sufficient evidence to substantiate his long-term disability.  The Supreme Court has held that "plan administrators are not obliged to accord special deference to the opinions of treating physicians."  <u>Nord</u>, 538 U.S. at 825.  However, insofar as the opinions of these consultant doctors were based on a standard of proof that, in this court's view, is *de novo* wrong, MetLife cannot establish that its factual determinations are *de novo* right.

In this case, Dr. Schroeder determined that Mr. Burt's proffered evidence failed "to substantiate sustained, global, specific and objective psychiatric functional impairment . . . ."  MetLife is not entitled to rely on Dr. Schroeder's analysis insofar as it is colored by the "objective evidence" requirement that this court has heretofore rejected, especially given this court's finding that MetLife neither requested that Mr. Burt submit himself to a particular "objective test" nor acceded to Dr. Aleem's request for an independent medical examination.  Stripped of the refrain that Mr. Burt has failed to substantiate his disability with objective evidence, Dr. Schroeder's letters are unconvincing.  They appear exceedingly dismissive of Dr. Aleem's diagnoses and also cherry pick facts concerning Mr. Burt's daily routine that, while inconsistent with the diagnosis that Mr. Burt was in, say, a vegetative state, were not

necessarily *inconsistent* with someone who was

unable to work as a senior manager at a consulting firm.

The Eleventh Circuit has affirmed a district court judgment that a plan administrator was *"de novo* wrong" on the basis that the administrator "completely ignored" the opinions of the claimant's treating physicians. Langford, 138 Fed. Appx. at 164.   The rationale behind this holding was that the claimant is entitled to a full and fair review.  This rationale applies equally in this case.  Dr. Kessler's October 6, 2003, opinion letter does not appear to have made any assumptions as to an objective evidence requirement, stating only that the "available medical documentation does not provide support for the need for restrictions and/or limitations in work functions."   In this case, Dr. Kessler did not "completely ignore" the significant number of evidentiary submissions that Mr. Burt made after October 6, 2003, because those submissions were not available to Dr. Kessler at the time he formed his opinion. As Mr. Burt made material additions to the record after Dr. Kessler's review -- including evidence of Dr. Hutto's second opinion --  MetLife's denial of coverage determination was *de novo* wrong insofar as it was based on Dr. Kessler's opinion letter alone.  As (1) both the opinions of Drs. Schroeder and Kessler are insufficient bases for the factual determination that Mr. Burt had failed to substantiate his claim; (2) there is no other significant record evidence tending to contradict Dr. Aleem or

Dr. Hutto's professional opinions; and (3) given that Mr. Burt otherwise carried his burden of substantiation, MetLife's denial of benefits to Mr. Burt is *de novo* wrong.

> 2.    *Whether Mr. Burt Was Receiving Appropriate Care*

MetLife relies on <u>Gough v. Metropolitan Life. Ins. Co.</u>, No. 3:03-0158, 2003 WL 23411993 (M.D. Tenn. Nov. 21, 2003), in which the district court granted summary judgment to the plan provider in part because the claimant failed to follow-up on referrals for psychiatric evaluation and management, "and there [was] no record of him receiving any medical care and treatment for a psychiatric disorder or condition." <u>Id.</u> at *12.  However, <u>Gough</u> is inapposite.  In this case, Mr. Burt produced evidence that he was under the regular care and supervision of Dr. Aleem, who monitored his prescription intake and conducted routine mental status exams.  The record also suggests that Mr. Burt sought therapeutic assistance from Tommy Boone between December 2002 and April 2003, and sought of his own volition a second opinion from Dr. Hutto.  Therefore, MetLife's factual determination that Mr. Burt failed to comply with the appropriate care requirement of the Plan is *de novo* wrong.

Furthermore, the court reads MetLife's summary judgment motion and its April 5, 2003, denial letter as interpreting the Plan to require psychotherapeutic as well as psychiatric treatment.  In denying Mr. Burt's claim, MetLife references Dr.

Schroeder's opinion, which, in turn, referenced American Psychiatric Association Guidelines for the treatment of major depression.   These Guidelines state that "a combination of psychotherapy . . . and pharmacoptherapy have been found to be superior treatment."   Even if this generic statement of best practices *should* have governed Mr. Burt's treatment, the Plan documents do not require as much as a matter of law.   As the Circuit Court in <u>Heller v. Equitable Life Assur. Soc.</u>, 833 F.2d 1253 (7th Cir. 1987) concluded,

> [t]he clause, "under the regular care and attendance of a physician," was not intended to allow the insurer to scrutinize, determine, and direct the method of treatment the claimant receives. . . .   [T]he purpose of the clause . . . is to determine that the claimant is actually disabled . . . is not malingering, and to prevent fraudulent claims.

<u>Id.</u> at 1257 (internal citation omitted).   In Mr. Burt's case, the term "appropriate care" properly encompasses pharmacological treatment coupled with routine visits with a psychiatrist such as Dr. Aleem.   Therefore, MetLife's legal determination as to the meaning of Plan provisions respecting appropriate treatment is *de novo* wrong.

In sum, the court concludes that MetLife's factual and legal determinations that Mr. Burt had failed to substantiate his disability and to receive appropriate care under the plan provisions and are *de novo* wrong.

B.       *The Reasonableness of MetLife's Denial of Benefits to Mr. Burt*

In granting a claim administrator's summary judgment motion, the court in

-25-

Fick v. Metropolitan Life Ins. Co., 347 F. Supp. 2d 1271 (S.D. Fla. 2004), maintained that "it is reasonable for a plan administrator to require objective medical evidence even where the plan does not specifically contain such a requirement." Id. at 1286. While this court is unwilling to read an objective evidence requirement into a contract not containing one, this court nonetheless understands that without such a requirement, benefits might be paid out to "participant[s] with subjective and effervescent symptomology simply because the symptoms were first passed through the intermediate step of self-reporting to a medical professional." Id. (citation omitted). The court concedes that it is reasonable for a plan administrator, who must "protect[] the assets of a plan, and pay[] legitimate claims" to construe "proof" and "evidence" as implying an objectivity requirement. Id. at 1287.

Common sense and a stream of legal precedent suggest, however, factual determinations of a treating physician *are* objectively more reliable. See Finazzi v. Paul Revere Life Ins. Co./UNUM Provident Corp., 327 F. Supp. 2d 790, 795–96 (W.D. Mich. 2004); Hunter v. Federal Express Corp., No. Civ. A. 03-6711, 2004 WL 1588229, at *11 (E.D. Pa. July 15, 2004) ("all else being equal, doctors' reports based on personal contact with a patient are generally more reliable assessments of the patient's condition than summaries of first-hand reports"). Despite this precedent, this court finds that MetLife pointed to sufficient evidence in the record reasonably calling into

question whether Mr. Burt was so incapacitated as to be unfit to resume his own occupation.  This court declines to presume that simply because a person such as Mr. Burt is capable of going to Starbucks and visiting with friends he is therefore fit for work as a full-time senior manager at a consulting firm.  However, these facts and other record evidence of Mr. Burt's daily activities, as Dr. Kessler put it, are "inconsistent with Dr. Aleem's reports of social isolation."  Such evidence provided MetLife with a "reasonable basis" to deny Mr. Burt's disability evidence, "notwithstanding the contrary evidence produced by [Mr. Burt]."  Wise, 360 F. Supp. 2d at 1321 (citing Jett, 890 F. 2d at 1139, and Paramore v. Delta Air Lines, Inc., 129 F.3d 1446, 1452 (11th Cir. 1997)).  The court thus finds that MetLife's factual determination that the medical evidence did not substantiate Mr. Burt's inability to perform his own occupation is reasonable.

In addition, while MetLife was *de novo* wrong in interpreting the appropriate care provision of the Plan to require psychotherapy in addition to Mr. Burt's regular visits with Dr. Aleem, this interpretation was not unreasonable, particularly considering the interpretive possibilities of a word as vague as "appropriate." Furthermore, MetLife's factual determination that Mr. Burt was not undergoing appropriate care is supported by sufficient evidence in the record.  In particular, Dr. Aleem's assertion that "starting therapy again" would not "have a major effect on

[Mr. Burt's] prognosis" does not preclude a factual determination that additional therapy might have *some* positive effect on Mr. Burt's prognosis, perhaps a sufficient effect to restore Mr. Burt to work at his own occupation.

In sum, this court holds: (1) MetLife's legal interpretation of the Plan to require objective evidence substantiating Mr. Burt's condition is *de novo* wrong but reasonable; (2) MetLife's factual interpretation of the record as not substantiating "psychiatric functional impairment sufficient to prevent [Mr. Burt] from performing the essential duties of [his] occupation" is *de novo* wrong but reasonable; (3) MetLife's legal interpretation of the plan provisions seemingly as to require psychiatric as well as psychotherapeutic treatment is *de novo* wrong but reasonable; and (4) MetLife's factual determination that Mr. Burt, in not receiving psychotherapeutic as well as psychiatric treatment, was not receiving appropriate treatment is reasonable.

C.    *Burden Shifting Analysis*

1.    *The Standard*

As for legal interpretations of plan provisions, the law in the Eleventh Circuit appears fairly clear: "A wrong but apparently reasonable interpretation is arbitrary and capricious if it advances the conflicting interest of the administrator at the expense of the claimant." Williams, 373 F.3d at 1138. A Plan administrator's decision can still receive judicial deference, however, if the administrator can

-28-

"demonstrate a routine practice or give other plausible justifications such as benefitting the interests of other beneficiaries." Id.

The Eleventh Circuit in Williams elected to "leave the issue" as to whether this burden shifting approach applies equally to factual determinations "to another day." Id. at 1139. In Williams, the Eleventh Circuit read an earlier case, Levinson, as not saying whether the "heightened arbitrary and capricious, burden shifting approach should be applied to factual determination cases like this." Id. at 1138–39. Then, rather summarily, the Williams Court asserted, "[w]e also had no occasion to so conclude in Shaw." Id. at 1139.

At one level, the Williams Court's characterization of Shaw is accurate – the Shaw court neither engaged in nor endorsed the burden shifting analysis. However, on another level, the Williams Court's characterization of Shaw appears not to have fully considered the case, which was entirely appropriate considering Williams did not rest on factual determination grounds. Despite the Eleventh Circuit's determination in Shaw that the District Court properly determined that a plan administrator was de novo wrong in denying benefits to a claimant, the Court held that the District Court erred in granting the claimant summary judgment because there were genuine issues of material fact concerning whether "[the claimant] was totally disabled." Shaw, 353 F.3d at 1278, 1286. The Eleventh Circuit Court

concluded that "[g]iven the sharply conflicting evidence," <u>id.</u> at 1286, "the case cannot be resolved on summary judgment; accordingly, the case must be remanded for a bench trial." <u>Id.</u> At the bench trial, the judge was to "then determine whether the plan administrator's decision was 'wrong and unreasonable' with the benefit of a fuller record." <u>Id.</u>

As this court reads <u>Shaw</u>, in a dispute where the plan administrator is *de novo* wrong as to plan interpretation but where both parties meet their summary judgment burdens of demonstrating a disputed issue of material fact at the *de novo* stage as to whether the claimant qualifies as "disabled," the proper course is for the trial court to submit the disputed facts to a bench trial.

If "*de novo* review" means the same thing in the context of disputes involving claims administrators vested with discretion to interpret the legal meaning of plan provisions as in the context of disputes involving claims administrators vested with no such discretion, then this court can only read <u>Williams</u>, which contemplates claims administrator's *de novo* wrong factual determinations proceeding through reasonableness review (rather than a bench trial), as substantially limiting if not overruling <u>Shaw</u>. The court does not arrive at this interpretation lightly, as the court is always mindful of its obligation to abide by precedent of the Eleventh Circuit. The court has noted that another judge on this court appears to have arrived at this

interpretation as well.

In <u>Wise</u>, the District Court interpreted this apparent conflict in the case law as an invitation to "modify [the] burden shifting approach" rather than proceed to a bench trial. <u>Wise</u>, 360 F. Supp. 2d at 1321. The <u>Wise</u> court noted that the "inherent stumbling block in a strict application" of the burden shifting approach to factual determination cases is:

> that the denial of benefits with respect to one plan participant always increase the reserves out of which other participants may receive payments, thus providing a constant altruistic "justification" for the insurer's denial of the claim *vis-a-vis* the beneficiaries of the plan. Nevertheless, where, as here, the administrator suffers from a "strong conflict" in that it must pay the claim out of its own funds, that "justification" is likewise invariably self-serving . . . .

<u>Id.</u> at 1321–22 (internal citation omitted). The <u>Wise</u> Court, therefore, determined that a conflicted plan administrator can carry its summary judgment burden at the burden-shifting stage "if it can demonstrate that the opinions and evidence it relied on denying the plaintiff's claim were, viewed both from a qualitative and quantitative perspective, at least as objectively reliable as the countervailing opinions and evidence then before it." <u>Id.</u> at 1323.

The <u>Wise</u> Court's thoughtful approach, however, only further enmeshes the court in medical analyses that it is particularly unqualified to perform. This court is not a medical expert nor is it necessarily as familiar with the medical industry as a

claims administrator.  This court is reticent, particularly at the summary judgment stage, to assume the role of a surrogate claims administrator, weighing the respective objective values of various medical tests and doctors' reports.

Therefore, this court concludes that with factual determinations as well as legal determinations, the proper course is to employ, with one caveat, the burden shifting approach as specified in Brown v. Blue Cross and Blue Shield, Inc., 898 F.2d 1556, 1568 (11th Cir. 1990), which requires the plan administrator to "purge the taint of self interest" by producing evidence that its determinations benefitted the class of plan participants or represented a uniform construction of the Plan.  That caveat is that the claim provider cannot meet its burden simply by asserting that its denial of coverage as to one claimant benefits the plan participants to the extent that there is more money available to pay out "worthier" claims.

2. *Application of the Standard*

The application of the foregoing standard to this case is comparatively straightforward.  MetLife has offered no evidence that its *de novo* wrong but reasonable factual interpretation of the record as not substantiating "psychiatric functional impairment sufficient to prevent [Mr. Burt] from performing the essential duties of [his] occupation" benefitted the class of plan participants or represented a uniform construction of the policy.  Neither did MetLife offer any evidence

supporting the finding that its legal interpretation of the plan provisions seemingly as to require psychiatric as well as psychotherapeutic treatment benefitted the class of plan participants or represented a uniform construction of

the policy.  The same can be said of MetLife's factual determination that Mr. Burt, in not receiving psychotherapeutic as well as psychiatric treatment, was not receiving "appropriate treatment."  In light of these findings, the court holds that MetLife has not carried its burden of purging itself of the taint of self-interest.  Therefore, Mr. Burt's Motion for Summary Judgment is GRANTED.

## IV.   <u>Breach of Fiduciary Duty</u>

It is unclear to the court whether Mr. Burt maintains a claim for breach of fiduciary duty independent of his denial-of-benefits claim.  Although such a breach is alluded to at paragraph 32 of the Complaint, Mr. Burt des not address it fully in his Motion for Summary Judgment.  By passing 29 U.S.C. § 1101, Congress established standards of conduct, responsibility, and obligations for fiduciaries of employee benefit plans.  <u>See</u> 29 U.S.C. § 1101; 1 Ronald J. Cooke, <u>ERISA Practice and Procedure</u> § 6:1 (2d ed. 2004).  In this case, however, Mr. Burt has not provided the court with specific allegations or references in the record as to when or how MetLife breached a fiduciary duty to him independent of its benefits denial, and the court will therefore not engage in a purely speculative analysis as to whether some other fiduciary duty

was breached.  Therefore, Mr. Burt's motion for summary judgment on the issue of whether MetLife breached a fiduciary duty independent of its denial of benefits is DENIED.

## V.      Plaintiff's Motion To Amend

Pursuant to Local Rule 15.1, Plaintiff's Motion to Amend is hereby GRANTED.

## VI.     Defendant's Motion to Amend

Pursuant to Local Rule 15.1, Defendant's Motion to Amend is hereby GRANTED.

## VII.    Remaining Issue to be Resolved

Before this court can conclude its involvement in this case by way of entry of a judgment, the dollar amount of the judgment must be established.  Because this court understands that the process by which a damage award would be established would require the court to hear and weigh evidence, the court will shortly be sending a notice to the parties establishing a date and time for a bench trial on this issue.  In the meantime, if the parties would prefer to have this court decide on the amount of the judgment based upon written submissions to the court, they may certainly waive their right to a bench trial on this issue, by simply notifying the court of their preference in writing.

## VIII.   Summary

-34-

In sum, Plaintiff's Motion for Summary Judgment [Doc. No. 13] is GRANTED. Defendant's Motion for Summary Judgment [Doc. No. 14] is DENIED. Plaintiff's Consent Motion to Amend Plaintiff's Statement of Material Facts In Support of His Motion For Summary Judgment and Plaintiffs' Brief In Support of His Motion For Summary Judgment [Doc. No. 17] is GRANTED. Defendant's Motion to Correct Defendant's Memorandum in Opposition to Plaintiff's Motion For Summary Judgment [Doc. No. 24] is GRANTED.

IT IS SO ORDERED, this 16th day of September, 2005.

s/Beverly B. Martin
BEVERLY B. MARTIN
UNITED STATES DISTRICT JUDGE